IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| AINA NUI CORPORATION, | CIVIL NO. 13-00438 DKW-RLP |
| Plaintiff, | |
| vs. | ORDER DENYING PLAINTIFF AINA NUI CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT |
| SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior; UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL ASHE, in his official capacity as Director of the U.S. FWS, | |
| Defendants. | |

**ORDER DENYING PLAINTIFF AINA NUI CORPORATION'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING FEDERAL
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Aina Nui Corporation ("ANC") challenges the United States Fish and

Wildlife Service's (the "Service" or "FWS") designation of a portion of ANC's land

holdings on Oahu as critical habitat for species listed as threatened and endangered

pursuant to the Endangered Species Act, 16 U.S.C. §1531, *et seq.* ("ESA"). ANC

1

contends that the designation violates the ESA, Administrative Procedure Act, 5 U.S.C. §551, *et seq.* ("APA"), and National Environmental Policy Act, 42 U.S.C. §4321, *et seq.* ("NEPA").

Because the Service promulgated the Final Rule in compliance with public notice and comment requirements, designated critical habitat utilizing an ecosystem approach that is consistent with its statutory mandate, and properly determined that a portion of ANC's land holdings is essential to the conservation of species identified in the Final Rule, and because the Service's critical habitat designation is not subject to NEPA review as a matter of law, the Court DENIES ANC's Motion for Summary Judgment and GRANTS Federal Defendants' Cross-Motion for Summary Judgment.

## BACKGROUND

### I.    Critical Habitat Designation Process

#### A.    ESA Overview

Section 4 of the ESA requires the Service to determine when a species is "threatened" or "endangered," designations that trigger various statutory and regulatory protections.   16 U.S.C. §§ 1533, 1538.   When the Service determines that a particular species is threatened or endangered, Section 4 also requires the

Service to designate a "critical habitat" for the species.   16 U.S.C. § 1533(a)(3).

Section 3 defines "critical habitat" to include:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).   After identifying the geographic area that meets this two-pronged definition, the Service may nonetheless exclude certain portions of that area "if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . the failure to designate such area as critical habitat will result in the extinction of the species concerned." 15 U.S.C. § 1533(b)(2).

In short, critical habitat designation generally involves three steps:

> (1) identifying those areas occupied by the species that contain the features essential to the species' survival, (2) determining if any areas unoccupied by the species are essential for the conservation of the species, and then (3) excluding from these two areas any portions where the benefits of exclusion outweigh the benefits of inclusion, so long as such exclusion will not result in the species' extinction.

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 2011 WL 73494, at *2 (C.D. Cal. Jan. 8, 2011).

Critical habitat is further governed by regulations that compel the Service to "focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species." 50 C.F.R. § 424.12(b). These "principal constituent elements" ("PCEs") "may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." *Id.*

On September 18, 2012, the Service designated 42,804 acres on Oahu as critical habitat for 124 threatened and endangered species, including a plant known as the 'Ewa Plains 'akoko. *See* 77 Fed. Reg. 57648 (Sept. 18, 2012) ("Final Rule"). The designation includes 96 acres owned by ANC (the "Property") within the Kapolei West project ("Project"). The Final Rule designates "Lowland Dry Unit 8" ("LDU-8"), consisting largely of ANC's Property, as critical habitat for 16 plant species, including the 'akoko. According to ANC, the LDU-8 critical habitat designation will significantly impact its planned development of 559 resort-residential homes, 223 affordable homes, and half of an 18-hole golf course. ANC Mot. for Summary Judgment (Dkt. No. 32), at 1. ANC asks the Court to

invalidate and enjoin the Service from enforcing the Final Rule, at least to the extent it affects LDU-8, and to remand the Final Rule for designation of critical habitat in accordance with federal law.

### B.    Critical Habitat Designation and Rulemaking History

The Service listed the 'akoko as endangered in 1982.   Notwithstanding this designation, the Service did not identify critical habitat for the 'akoko at that time because the essential habitat elements could not be identified in the greatly altered ecosystem of the 'Ewa Plain.   47 Fed. Reg. 36846-48 (Aug. 24, 1982).   The 1982 listing provided, however, that should further study identify areas deemed essential to conservation, they might be designated as critical habitat.   By 1994, such further study included the Service's draft recovery plan for the 'akoko ("1994 Recovery Plan").   AR 26145-26232.   At that time, there were only four known populations of 'akoko on the 'Ewa Plain.   AR 26166.   Human-induced habitat loss, competition from non-native plant species, and fire had been the major causes of decline.   AR 26176-79.

The 1994 Recovery Plan specified that each of the four existing 'Ewa Plains populations should be restored to greater numbers, with the following targets: Population 1, 5,000 plants; Populations 2 and 4, a minimum of 1,000 reproductive plants; and Population 3, a minimum of 1,000 plants.   AR 26193, 26200-04.   The

1994 Recovery Plan also established the following criteria for downgrading the 'akoko's listing from endangered to threatened: at least three self-reproducing populations in each location with a minimum of 1,000 reproductive plants, with a land area sufficient to provide a buffer of thirty to fifty meters around the expanded population, in addition to maintenance of the 30,000 plants on the Island of Moloka'i. AR 26191.

With these targets in mind, the Service began its rulemaking for critical habitat designation in early 2008. AR 8633, 8637. On August 2, 2011, the Service published a notice of proposed rulemaking to list 23 species on the island of Oahu as endangered, and to designate or revise critical habitat for those 23 species as well as for 101 previously listed plant species, including 'akoko and Achyranthes. 76 Fed. Reg. 46362 (Aug. 2, 2011) ("Proposed Rule"). The Service proposed LDU-8 as critical habitat for 'akoko, Achyranthes, and 14 other species. The Proposed Rule stated that LDU-8 provided the PCEs necessary for the reestablishment of wild populations of all 16 species. The PCEs were defined by elevation, precipitation, substrate, and associated native plants, in addition to species-specific requirements, such as coral outcrop substrate for 'akoko. *Id.* at 46409, 46415. To identify critical habitat, the Proposed Rule utilized what the Service referred to as the "ecosystem approach," whereby, in addition to the features essential to the

conservation of each species, the Service determined "that the conservation of each depends, at least in part, on the successful functioning of the physical or biological features of the commonly shared ecosystem." *Id.* at 46409, 46365.

The initial public comment period closed on October 3, 2011. 76 Fed. Reg. 46362. ANC and the affiliated James Campbell Company LLC submitted comments on the Proposed Rule, asserting that land within LDU-8 should not be designated as critical habitat because it was not suitable for the listed species, lacked the necessary PCEs, and was not essential for the conservation of the listed species. AR 9047. The Service also received comments in opposition to the designation of LDU-8 from State agencies, but did not receive comments specifically supporting designation of LDU-8. *See* AR 9011-9259. The Service held a meeting with Steve Kelly, a James Campbell Company representative, on October 14, 2011, to discuss the company's request to re-evaluate the designation of LDU-8. AR 9011. The Service also conducted a site visit of LDU-8 with Kelly and other James Campbell Company representatives in November 2011. AR 3007-15, 4759.

On April 12, 2012, the Service made available the draft economic analysis ("DEA") that evaluated the economic effects of the proposed designation, proposed the removal of 185 acres from the area previously earmarked as critical habitat from within LDU-8, and reopened the public comment period. 77 Fed. Reg. 21936

(Apr. 12, 2012). The Service specifically sought comment on whether PCEs were present in LDU-8, whether all of LDU-8 was essential for the conservation of the species, and the possible economic impacts of the designation of LDU-8 as critical habitat. AR 21937. The Service also requested information on any planned land use activities that might require a federal permit, license, funding, or other federal assistance. 77 Fed. Reg. at 21942.

The second comment period closed on May 14, 2012. 77 Fed. Reg. 21936. The Service received 19 comments on the DEA, including comments from ANC and its affiliates, criticizing the methodology of the economic analysis. AR 11643-53. ANC also objected that the Service's proposed acreage reduction from LDU-8 did not go far enough in that ANC's remaining 96 LDU-8 acres still did not meet the standards for critical habitat. AR 11638; AR 11643-53.

In June 2012, the Service conducted another site visit to LDU-8 with ANC and James Campbell Company representatives. AR 02991a-3039a. Following the visit, the Service reaffirmed its prior finding that LDU-8 possesses the physical and biological features of the lowland dry ecosystem as well as the specific coral outcrop PCE for 'akoko. *Id*.; AR 03040a-03088a ("June 2012 Site Visit Report"). The Service did not make the June 2012 Site Visit Report available for public review or comment before issuance.

In June 2012, the Service also completed its "2012 Recovery Needs and Strategy for *Chamaesyce skottsbergii* var. *skottsbergii*" ("Recovery Strategy"), also referred to as a "white paper." AR 29528. The Recovery Strategy specifies the number of populations, number of plants within each population, and land area required for each population to achieve recovery of 'akoko. As with the June 2012 Site Visit Report, the Recovery Strategy was not made available for public review or comment during the rulemaking process.

### C.    Final Rule

The Service finalized its economic analysis in July 2012 ("FEA"). AR 1204-99. Because it intended to remove considerable acreage from the area previously earmarked as critical habitat from within LDU-8, lost property value estimates required reassessment. AR 1243. Using information provided in ANC's May 2012 comment letter, as well as real property appraisal information from the City and County of Honolulu, the Service calculated ANC's parcels in the revised unit to have a current land value assessment of $32.3 million. AR 1264. The Service assumed that development would be precluded on the portion of the parcels designated as critical habitat and calculated the property value loss at just over $7.6 million. AR 1277, 1280. The estimated administrative costs for a

Section 7 consultation for a Federal agency or applicant remained unchanged from the DEA.   AR 1276.

On September 18, 2012, the Service published the Final Rule, listing 23 species as endangered, designating critical habitat for two previously-listed species, and revising the critical habitat designation for 99 other Oahu species.   77 Fed. Reg. 57648.   A total of 42,804 acres were designated as critical habitat, after 307 acres were removed from the proposed designation, including 193 acres removed from LDU-8.   *Id.* at 57714.   According to the Service, it solicited peer review from 13 experts regarding the Oahu plants and animals covered by the Final Rule.   *Id.* at 57656.   Four experts responded, and generally concurred with the Service's methods and conclusions, with none criticizing either the "ecosystem approach," the designation of 'akoko, or the designation of critical habitat within LDU-8.   *Id.*   The Final Rule concluded that the Service's economic analysis "did not identify any disproportionate costs that are likely to result from the designation" and therefore the Service declined to exclude any part of LDU-8 (or other units) from critical habitat based on economic impacts.   *Id.* at 57740.

The Final Rule discussed the two LDU-8 site visits with ANC affiliates in November 2011 and June 2012, through which the Service verified the existence of the lowland dry ecosystem PCEs and the PCE of coral outcrop substrate for the

'akoko.  *Id*. at 57714.   The Service found these features essential to the conservation of the species in this location based on the need to reestablish 'akoko where it historically occurred.  *Id.*   According to the Service, the species requires seven to eight populations containing a total of 10,000 mature individuals with at least 1,000 mature individuals per population in order to recover.  *Id.*   The Final Rule notes that, including LDU-8, only four sites on the 'Ewa Plain remain with the essential features that have not already been modified by construction, development, or excavation activities; were large enough to provide habitat for at least one self-sustaining population; and provided adequate distribution across the historical range of the species.   The Final Rule further states that, although LDU-8 is currently unoccupied by the species, limiting critical habitat to currently-occupied areas would not ensure the conservation of the 'akoko.   As to the remaining species, the Service concluded that, even though LDU-8 was not occupied by those species at the time of their listings, the unit is essential for their conservation because of the need to reestablish wild populations in order to bolster the small numbers of individuals or low population sizes.  *Id.*

The Final Rule responds specifically to public comments opposed to the inclusion of LDU-8:

Following the [November 2011] field visit, it was determined that approximately 193 acres of the 292 acres proposed were too degraded to support akoko or to be functionally restored to support the essential features and habitat for akoko. It was further determined during that field visit and a subsequent field visit in June 2012, that 99 acres (40 ha) contained the features essential to the conservation of akoko and could be adequately restored to allow for a functioning population of akoko if re-established.

. . . .

Based on the revisions the final rule makes to Oahu—Lowland Dry—Unit 8, many of the specific lands that commenters were concerned with were removed from the designation due to the lack of features or because they were so degraded.

*Id*. at 57660. ANC notes that 96 of the remaining 99 LDU-8 acres designated as critical habitat are within its Project development footprint; the remaining 3 acres are an active historic railroad right of way owned by the State. AR 35577.

In response to public comments assailing the DEA, and specifically the assumption that a federal nexus may not exist, the Final Rule explains in part:

to evaluate potential impacts from the designation given the uncertainty of whether there may be a Federal nexus and how many specific consultations there may be, we evaluated a range in the DEA and our final rule. At one end of the range, we assume that there will be no Federal nexus. In this case, because there is no regulatory effect under the Act for a designation of critical habitat absent a Federal nexus, we assume there will be no impact from the designation. This constitutes the lower bound that is identified in the DEA, and we still believe this scenario could occur. At the other end of the range, where a

Federal nexus is assumed, we also assume that the consultation resulting from the designation of critical habitat would take into consideration the entire master planned project based on past comparable examples. For example, one property owner (James Campbell Company LLC) commented that the entire 107 acres (43 ha) being designated within Oahu—Lowland Dry—Unit 8 fall within the Kapolei West project, which is slated for residential and mixed-use development, with development rights vested by several public approval processes and County ordinance. They also commented that the land use entitlement process for Kapolei West began in the 1980's and was assessed in an Environmental Impact Statement prepared under Hawaii Revised Statutes Chapter 343 (Kapolei West Expansion Area Final EIS, June 2005; James Campbell Company LLC letter dated May 12, 2012). Because the consultation is anticipated to be for the entire master planned community, then the specific number of parcels may not be significant. The final economic analysis reexamined the potential upper-bound of economic costs, including administrative costs to the Service, Federal agencies, and third parties. The estimated combined administrative costs in occupied and unoccupied critical habitat is $145,000 over a 20-year period ($94,178 using a 7 percent discount rate, $117,075 using a 3 percent discount rate). The total administrative costs (i.e., costs related to section 7 consultation) in occupied areas are estimated to be $105,000 over a 20-year period (or $54,178 using a 7 percent discount rate—$77,075 using a 3 percent discount rate). Combined annualized costs over this period are $8,776 using a 7 percent discount rate, or $7,000 using a 3 percent discount rate (Service 2012, Table ES–12).

77 Fed. Reg. 57661.

The Final Rule also responds to criticism that the PCEs for ecosystems are arbitrary and capricious:

We consider the PCEs to be the specific compositional elements of physical and biological features that are essential to the conservation of the species. This final rule identifies the appropriate PCEs sufficient to support the life history processes for each species within the ecosystems in which they occur, and reflects a distribution that we believe is essential to the species' recovery needs within those ecosystems. The ecosystems' features include the appropriate microclimatic conditions for germination and growth of the plants (e.g., light availability, soil nutrients, hydrologic regime, and temperature) and space within the appropriate habitats for population growth and expansion, as well as to maintain the historical geographical and ecological distribution of each species. The PCEs are defined by elevation, annual levels of precipitation, substrate type and slope, and the potential to maintain characteristic native plant genera in the canopy, subcanopy, and understory levels of the vegetative community.

*Id.* at 57660.

## II.  **Litigation Overview**

Following publication of the Final Rule, ANC issued, on May 13, 2013, a 60-day ESA citizen suit notice. The Service responded to the notice by letter dated July 12, 2013, declining to either withdraw or revise the Final Rule.

On August 30, 2013, ANC filed the instant action generally asserting that the Court should set aside the Final Rule pursuant to the APA, 5 U.S.C. §706(2)(A). The complaint alleges six causes of action: (1) failure to allow public review and comment required by both the APA, 5 U.S.C. §§ 553, 706, and the ESA, 16 U.S.C. § 1533; (2) failure of PCEs to identify the listed species' biological needs, as required

by the ESA, 16 U.S.C. §§ 1532 and 1533, and 50 C.F.R. § 424.12; (3) designation of critical habitat that lacks the PCEs for listed species, in violation of the ESA, 16 U.S.C. §§ 1532 and 1533, and 50 C.F.R. § 424.12; (4) designation of areas as critical habitat that are not essential to the conservation of the species, in violation of the ESA, 16 U.S.C. §§ 1532 and 1533, and 50 C.F.R. § 424.12; (5) inadequate consideration of economic impacts, in violation of the ESA, 16 U.S.C. § 1533; and (6) failure to comply with NEPA, 42 U.S.C. § 4332.

In its motion for summary judgment, ANC argues that the Service: violated the APA and ESA by withholding key documents from public review; violated the ESA by utilizing an "ecosystem approach"; unlawfully designated the Property as critical habitat without the PCEs for listed species; violated the ESA by failing to consider all economic impacts of designating LDU-8; and violated NEPA by failing to analyze the significant environmental effects of the Final Rule. In its cross-motion, the Service asserts that: ANC lacks prudential standing for its NEPA claim and that the claim is without merit; the development of the Final Rule comports with public review requirements; and the Final Rule complies with the ESA because LDU-8 has the lowland dry ecosystem PCEs and coral outcrop

substrate essential to the conservation of the 'akoko and the 15 other listed species, and the Service correctly considered the economic impact of designation.[1]

**STANDARD OF REVIEW**

Where an agency has taken final action, a court may set aside that action under § 706(2)(A) of the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the arbitrary and capricious standard is narrow, and courts give deference to an agency's construction of a statutory provision it is charged with administering. *Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth.*, 204 F.3d 1272, 1274-75 (9th Cir. 2000). Courts must determine whether the agency's decision was based on a consideration of the relevant factors or whether there has been a clear error of judgment. *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000). The reviewing court's inquiry, though narrow, must be "'searching and careful.'" *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

---

[1]The Service initially argued in its cross-motion that ANC lacked standing to bring its ESA claims, but withdrew that argument at the hearing on the motions. Accordingly, the Court does not reach this issue.

Review of agency actions is "highly deferential," "presume[s] the agency action to be valid," and requires that the Court affirm the agency action "if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted); *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (A court's function is limited to determining whether the evidence in the record "permitted the agency to make the decision that it did."). The Court is not to substitute its judgment for that of the agency, and deference to the agency's technical expertise and experience is particularly important with respect to questions involving scientific matters. *Id.*; *see also Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993) (citation omitted). However, "the presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned." *Greenpeace v. National Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000). ANC, the party challenging the agency's action here, bears the burden of proof. *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 97 (D.D.C. 2010) (citation omitted).

**<u>DISCUSSION</u>**

The Court begins its analysis by addressing ANC's procedural arguments relating to the record, and then turns to the substance of ANC's ESA and NEPA claims.

**I.    The Service Did Not Violate the APA or ESA by Withholding Documents from Public Review**

The APA generally requires an agency to make available to the public, for review and comment, the materials on which it relies in making a final decision. 5 U.S.C. § 553(b)-(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401-02 (9th Cir. 1995). If an agency adds critical new information to the record after the close of a public comment period, it must reopen the comment period. *Id.* "[A]n agency, without reopening the comment period, may use supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown." *Id.* at 1402 (citation omitted). Courts determine "the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the . . . opportunities it provided." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).

ANC contends that the Service improperly withheld from public review and comment the 2012 Recovery Strategy for 'akoko and the June 2012 Site Visit Report.   The Court addresses each document below.

## A.      2012 Recovery Strategy

The draft 1994 Recovery Plan for 'akoko required three populations of 'akoko on Oahu, with at least 1,000 plants per population.   AR 26150, 26191.   ANC asserts that, under the 1994 Recovery Plan, LDU-8 would not have been "essential" for the conservation of 'akoko because LDU-9, -10 and -11 together could hold five or six populations, exceeding the 1994 Recovery Plan's requirements.   AR 29531. Under the 2012 Recovery Strategy, however, ten populations of 1,000 plants are required for recovery, leading to the conclusion that "all of the proposed critical habitat [must be] maintained," including LDU-8.   The Recovery Strategy concludes that the critical habitat proposed for designation would allow for seven to eight populations with a total of at least 10,000 plants, which would suffice for recovery if "all of the proposed critical habitat is maintained."   AR 29531.

### 1.  The Recovery Strategy Does Not Contain Critical New Information

ANC argues that the Recovery Strategy presented critical information that altered the justifications and conclusions the Service relied upon to support the Final

Rule, and that the Service was therefore required to permit public comment on the document.   Among other things, ANC maintains that the need for 33 acres per 'akoko population is first set forth in the Recovery Strategy.

The Service contends that it was not required to reopen the public comment period because the Recovery Strategy's expanded discussion of the importance of LDU-8 is a direct response to comments submitted by ANC itself.   It also argues that the Recovery Strategy is a synthesis of existing data, which enabled the Service to respond more fully to concerns and confirm prior determinations.   It asserts that the Final Rule simply provides a more detailed discussion of the population levels needed to achieve recovery and the habitat and space necessary to achieve this expansion, and that the need to re-establish additional populations in order to conserve and recover the species is not a new rationale, but was set forth in the Proposed Rule specifically with respect to LDU-8.   *See* 76 Fed. Reg. at 46445. According to the Service, because the Recovery Strategy merely responded to ANC's public comments that a smaller critical habitat designation could suffice (AR 11639) and confirmed the information on which the proposed rule was based, its publication does not compel the reopening of still more public comment. *Rybachek v. EPA*, 904 F.2d 1276, 1286 (9th Cir. 1990).

The question for the Court is whether the Recovery Strategy contains additional information that was not merely important but "critical" to the agency's determination.   The Service is not obligated to reopen the comment period unless the information is critical.   *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1403 (9th Cir. 1995) (citing *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 57-58 (D.C. Cir. 1984)); *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1074 (9th Cir. 2006).   After the comment period ends, the agency can add information that responds to comments on the proposed rulemaking, or "supplementary" data that "'expand[s] on and confirm[s]' information contained in the proposed rule[] and addresses 'alleged deficiencies' in the pre-existing data," provided no prejudice is shown.   *Id*. at 1402.

In *Idaho Farm Bureau Federation*, the agency relied upon a USGS study that was not available to the public at the time that the Service made a final listing decision.   The Ninth Circuit concluded that the USGS report was not "supplementary data," but was instead central to the agency's decision to list the Springs Snail as an endangered species.   This was so because the report "provided the only scientific information on the cause of decline in spring flows.   The USGS study provided unique information that was not duplicated in other reports."   58 F.3d at 1403.   The Ninth Circuit required the Service to "provide an opportunity for

21

public comment on the final USGS report and reconsider the listing decision thereafter." *Id.* at 1404.

The Ninth Circuit reached a different conclusion in *Kern County Farm Bureau*, holding that three post-comment period studies were not critical to the listing decision. "Unlike the post-comment study in *Idaho Farm Bureau Federation*, the new materials do not provide the sole, essential support for the listing decision." 450 F.3d at 1079. The *Kern County Farm Bureau* studies "confirm and expand on existing data, providing additional grounds," and "did not alter the justifications or conclusions that were vital to the listing decision." *Id.*

Upon careful review of the record in the instant matter, the Court concludes that the 2012 Recovery Strategy cited in the Final Rule did not add critical new information to the record after the close of the public comment period. The Final Rule references the Recovery Strategy in its discussion of LDU-8, addressing population distribution needs beyond the currently-occupied habitat:

> The numbers of individuals and numbers of populations calculated for the 4 Lowland Dry units for akoko was based on our analysis (white paper) "Recovery Needs and Strategy for Akoko," June 20, 2012. This analysis incorporated data from the Recovery Plan for *C. skottsbergii* var. *skottsbergii* and *Achyranthes splendens* var. *rotundata* (1993), surveys/species reports from 1979, 1981, 1984, and 2012, the Revised Recovery Objective Guidelines as determined by the Hawaii and Pacific Plants Recovery Coordinating Committee (HPPRCC) 2011, and

> plant genetics information from Guerrant et al. (2004, pp. 419–441) and Neel and Cummings (2003).

77 Fed. Reg. 57714.   The other studies referenced above, upon which the Recovery Strategy is based, are not new and were previously available.

For example, the Recovery Strategy applies the HPPRCC 2011 recovery criteria of 10 populations of 1,000 individuals.   AR 6997.   The Service had previously calculated the acreage necessary to achieve recovery, applying both a 1981 report and the HPPRCC 2011 recovery guidelines.   AR 6997-98.   The Recovery Strategy therefore represents an analysis of data that existed prior to the Proposed Rule and was available for public comment.   Unlike the USGS report relied upon in *Idaho Farm Bureau Federation*, the Recovery Strategy does not "provide the sole, essential support for the listing decision."   *Kern County Farm Bureau,* 450 F.3d at 1079.   Nor does it provide "unique information that was not duplicated in other reports."   *Idaho Farm Bureau Federation*, 58 F.3d at 1403. Finally, the "data did not alter the underlying reasons for the agency's conclusions." *Kern County Farm Bureau,* 450 F.3d at 1079-80.   Rather, the Recovery Strategy is referenced in the Final Rule as a response to ANC and its affiliates' public comments that a smaller critical habitat designation was appropriate, and expands the Proposed Rule's discussion of the importance of LDU-8.   "Nothing prohibits

[an a]gency from adding supporting documentation for a final rule in response to public comments." *Rybachek*, 904 F.2d at 1286.

In short, the Service was not required to reopen the comment period based on the Recovery Strategy.

## 2. The Recovery Strategy Does Not Revise The 1994 Recovery Plan

The ESA requires that an agency "prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan." 16 U.S.C. §1533(f)(4). ANC argues that the Service promulgated the Recovery Strategy in violation of this statutory obligation. According to ANC, the Recovery Strategy represents a revision of the draft 1994 Recovery Plan because it provides new criteria for 'akoko population size, area, and spatial distribution that replace those in the draft 1994 Recovery Plan. Yet no public notice and comment was made available.

There is no dispute that the critical habitat designation process is distinct from recovery planning requirements. *Cf.* 16 U.S.C. §§ 1533(a)(3) and (b)(2) (critical habitat designation) with 16 U.S.C. §1533(f)(1) (requirements for recovery plan). That is, a recovery plan is not required as part of the critical habitat designation process. *See* 16 U.S.C. §1533(f)(1) ("The Secretary shall develop and implement

plans (hereinafter in this subsection referred to as 'recovery plans') for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species."); *see also Friends of Blackwater v. Salazar*, 691 F.3d 428, 433 (D.C. Cir. 2012) ("Rather, § 4(f)(1)(B)(ii) states simply that the criteria in the recovery plan should be those "which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list.'").   The Final Rule itself refers to the Recovery Strategy as a "white paper," not as a recovery plan.   The Recovery Strategy here is not like a recovery plan in that it does not contain the statutorily required criteria.   *See* 16 U.S.C. §1533(f)(1).

To the extent ANC argues the Recovery Strategy is a de facto revision of the 1994 Recovery Plan, the argument fails.   For example, the finding in the Recovery Strategy that conservation can be achieved through seven to eight "management units," some larger than 1,000 individuals, is consistent with, not a revision of, preexisting analyses, including the draft 1994 Recovery Plan specification that the four then-existing 'Ewa Plains populations be restored to a total of 8,000 individuals.   *Cf.* AR 6997, 16328, 29530, 26193, 26200-04.

## B.    Objections to June 2012 Site Visit Report

ANC argues that the June 2012 Site Visit Report provided critical new information that led the Service to remove significant acreage from LDU-8.    *See* 77 Fed. Reg. 57714.    As with the Recovery Strategy, the Court concludes that the Service was not required to reopen the public comment period.    *See Kern County Farm Bureau,* 450 F.3d at 1079-80.

The record does not reveal any information in the June 2012 Site Visit Report that was not previously available for public comment or that represented critical new information.    Although ANC contends that the June 2012 site visit provided the essential "new" factual information that the Service relied on to conclude that only 99 acres of LDU-8 contained the PCEs for 'akoko, it fails to acknowledge that the June 2012 Site Visit Report simply restated conclusions already reached following the November 2011 site visit.    Following the November 2011 site visit, the Service found that 185 acres of LDU-8 were too degraded to be designated as critical habitat, *see* 77 Fed. Reg. at 57714, 21936, and that the 99 acres ultimately designated contained the necessary coral substrate.    AR 4755-56.    The June 2012 Site Visit Report also restated information already contained in the Proposed Rule -- namely that LDU-8 contains the lowland dry ecosystem PCEs and the unique coral substrate.    *Id.*    ANC, in fact, had already addressed these conclusions in an

October 2011 comment letter and subsequently participated in the November 2011 site visit. AR 3007-15, 3728, 9074-81. The November 2011 site visit and the resulting removal of 185 acres from LDU-8 were included in the reopened comment period, 77 Fed. Reg. at 21938, of which ANC again availed itself. AR 11660- 63 (commenting on whether LDU-8 contained the relevant PCEs).

In short, the Service was not required to reopen the comment period based on the June 2012 Site Visit Report.

## II.  ANC's Supplementary Documents Are Not Part of the Record

ANC claims that the economic and biological studies that it attached to its 60-day citizen suit notice are part of the administrative record and constitute the "best scientific data available" regarding the presence of PCEs within LDU-8. It argues that ESA section 4(b)(2) required the Service to take these studies into account in considering ANC's request to revise the Final Rule and exclude LDU-8. 16 U.S.C. § 1533(b)(2).

Courts limit their analysis of an agency's rulemaking to the information that was before the agency when it issued the challenged decision. Parties may not use post-decision information either to justify or attack an agency's decision. *See Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993); *Ctr. For Biological Diversity v. U.S. Fish and Wildlife Serv.*, 450 F.3d 930, 943-44 (9th

Cir. 2006) (listing exceptions to general rule).   The supplementary documents and facts offered by ANC as part of its 60-day citizen suit notice were not considered by the Service as part of its rulemaking and will not be considered by the Court.

ANC did not explain why it could not have offered the economic valuation analysis or biological studies attached to its citizen suit notice prior to issuance of the Final Rule.   Indeed, ANC provided extensive economic and scientific comment throughout the rulemaking process.   *See, e.g.*, AR 3020-41 (May 12, 2012 Letter, Comments on Draft Economic Analysis and Revision of the Proposed Rule); AR 3042-45 (May 10, 2012 Guinther Report, "Additional considerations relative to Critical Habitat and *Euphorbia skottsbergii* var. s*kottsbergii* at Barbers Point"); AR 3046-75 (May 2012 Critique of "Economic Analysis of Critical Habitat Designation for 124 Oahu Species" (Draft—February 2012)); AR 9047-82 (Oct. 3, 2011 Letter with attachments).   Permitting parties to supplement the record in the manner contemplated here – particularly without offering a justification – could indefinitely prevent an agency from closing the record prior to taking final action.   *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1334 (9th Cir. 1992) (parties may not establish a post-hoc scientific controversy through evidence that was not before the agency at the time of its action).

Moreover, the Service's decision to include ANC's 60-day citizen suit notice in the administrative record does not alter the Court's conclusion. Rather, notice is a frequently litigated issue in ESA cases. *See, e.g., Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520-22 (9th Cir. 1998); *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1072 (9th Cir. 1996); *Cetacean Community v. Bush*, 249 F. Supp. 2d 1206, 1214 (D. Haw. 2003). An agency's decision to include a copy of the notice in the administrative record in anticipation of litigating this issue should not result in a waiver of its argument that it need not have considered new information provided for the first time with the notice as part of its rulemaking.

Accordingly, the Service was not required to consider the Final Rule in light of the supplementary documents appended to ANC's 60-day citizen suit notice, and the Court declines to do so either.

## III.     The Service's Ecosystem Approach

The Court now turns to the substance of ANC's claims that the Service violated the ESA, first addressing the Service's "ecosystem approach." ANC argues that the Service was required to designate critical habitat, to the extent prudent and determinable, for each listed species, not for ecosystems, pursuant to

16 U.S.C. §§ 1533(a)(3)(A), (b)(2), and 1532(5)(A). It faults the Service for grouping undeveloped lands into seven different "ecosystem" types based on the gross physical characteristics of the lands, and then describing the native plants typically found within each ecosystem, instead of determining the PCEs essential to each listed species. ANC argues that the PCEs lack specificity and are contradictory.

The Service maintains that employing ecosystem attributes to identify PCEs for individual species is consistent with the ESA and its regulations, past FWS precedent, and the best available data for Hawaiian plants. Although the Final Rule revised the existing habitat designation for 99 species, which was based primarily on the specific localities where the species were known to occur, approximately 93% of the revised critical habitat designation overlaps with the prior designation. 77 Fed. Reg. at 57650, 57689. 'Akoko was *not* one of those species. However, the Service used data showing both historical and current occupation of the four lowland dry units designated for 'akoko. *Id.* at 57714-16. The Service asserts that it considered ecosystems that provide these aspects when determining the essential features for plant species. Where individual species required additional elements, those were also designated as PCEs, including the coral outcrop substrate for 'akoko. *Id.* at 57660.

ESA regulations require the Service to identify PCEs essential to a species' conservation, including "[h]abitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species." 50 C.F.R. § 424.12(b)(5). Furthermore, the list of appropriate PCEs includes many ecosystem-type attributes: ". . . seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." *Id.* at § 424.12(b).

The Final Rule explains the Service's decision to use an ecosystem approach:

> In 2003, the physical or biological features for each plant species were defined on the basis of habitat features of the areas actually occupied by the plants, which included plant community, associated native plant species, locale information (e.g., steep rocky cliffs, talus slopes, gulches, stream banks), and elevation (68 FR 35950; June 17, 2003). However, since 2003, we have found that many areas where these species are currently or recently reported are marginal habitat; the species occurs in these areas due to remoteness or inaccessibility to feral ungulates. In this final rule, the physical or biological features have been categorized into the ecosystem types on which these species depend. They have also been more precisely identified, and now include elevation, precipitation, substrate, canopy, subcanopy, and understory characteristics.

77 Fed. Reg. at 57698.

In the Final Rule, the Service also explains its methodology for determining the PCEs essential to support the successful functioning of the ecosystem upon which each species depends:

> We consider the primary constituent elements (PCEs) to be the elements of physical and biological features that, provide for a species' life-history processes and are essential to the conservation of the species. In this rule, PCEs for each of the 124 species are defined based on those physical or biological features essential to support the successful functioning of the ecosystem upon which each species depends, and which may require special management considerations or protection. *As the conservation of each species is dependent upon a functioning ecosystem to provide its fundamental life requirements, such as a certain soil type, minimum level of rainfall, or suitable water quantity (in the case of the three damselflies), we consider the physical or biological features present in the ecosystems described in this rule to provide the necessary PCEs for each species.* The ecosystems' features collectively provide the suite of environmental conditions within each ecosystem essential to meeting the requirements of each species, including the appropriate microclimatic conditions for germination and growth of the plants (e.g., light availability, soil nutrients, hydrologic regime, temperature); adequate instream flows and upland habitat for cover and foraging for the damselfly species; maintenance of upland habitat so that it provides for the proper ecological functioning of streams for the damselflies (e.g., water quality, water temperature); and in all cases, space within the appropriate habitats for population growth and expansion, as well as to maintain the historical, geographical, and ecological distribution of each species. *In many cases, due to our limited knowledge of the specific life-history requirements for these species, which are little-studied and occur in remote and inaccessible areas, the more general description of the physical or biological features that provide for the successful function of*

> *the ecosystem that is essential to the conservation of the species*
> *represents the best scientific information available.*
> Accordingly, for purposes of this rule, the physical or biological
> features of a properly functioning ecosystem are the physical or
> biological features essential to the conservation of the 124
> species in this rule that occur in those ecosystems.

77 Fed. Reg. at 57698 (emphasis added); *see also id.* at 57697-57703 (describing the

Service's methodology "identifying the occurrence for each species and determining

the ecosystems upon which they depend").   In response to critical public comments

regarding its ecosystem approach, the Final Rule explains that:

> The ecosystems' features include the appropriate microclimatic
> conditions for germination and growth of the plants (e.g., light
> availability, soil nutrients, hydrologic regime, and temperature)
> and space within the appropriate habitats for population growth
> and expansion, as well as to maintain the historical geographical
> and ecological distribution of each species.   The PCEs are
> defined by elevation, annual levels of precipitation, substrate
> type and slope, and the potential to maintain characteristic native
> plant genera in the canopy, subcanopy, and understory levels of
> the vegetative community.

77 Fed. Reg. at 57660.

Neither the ESA nor its implementing regulations prohibit the ecosystem

approach as employed by the Service in this instance.   *See Arizona Cattle Growers'*

*Ass'n v. Kempthorne*, 534 F. Supp. 2d 1013, 1022-23 (D. Ariz. 2008), *aff'd*, 606

F.3d 1160 ("No statute or regulation provides a formula for the Service to use in

setting forth PCEs.").   The pertinent regulations require identification of the

physical and biological features essential to a species' conservation, including

"[h]abitats that are protected from disturbance or are representative of the historic

geographical and ecological distributions of a species." 50 C.F.R. § 424.12(b)(5).

Appropriate PCEs expressly include attributes of ecosystems, such as "seasonal

wetland or dryland, water quality or quantity, host species or plant pollinator,

geological formation, vegetation type, tide, and specific soil types." *Id.* at

§ 424.12(b).

The Service determined the ecosystem attributes when considering the

essential features for the plant species at issue here. *See, e.g.,* 77 Fed. Reg. at 57698

(discussing identification of "the appropriate microclimatic conditions for

germination and growth of the plants (e.g., light availability, soil nutrients,

hydrologic regime, temperature); adequate instream flows and upland habitat for

cover and foraging for the damselfly species; maintenance of upland habitat so that it

provides for the proper ecological functioning of streams for the damselflies (e.g.,

water quality, water temperature); and in all cases, space within the appropriate

habitats for population growth and expansion, as well as to maintain the historical,

geographical, and ecological distribution of each species")); *see also* Tables 4 & 5

(identifying the physical or biological features of a functioning ecosystem for each

of the ecosystem types identified, and identifying unique PCEs for species). The

PCEs detailed by the Service address many of the categories contemplated by the regulation, and courts have upheld designations involving similar approaches. *See, e.g., Wyo. State Snowmobile Ass'n v. U.S. Fish and Wildlife Serv.*, 741 F. Supp. 2d 1245, 1261-62 (D. Wyo. 2010) (ecosystem PCEs); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 122 (D.D.C. 2004) (identifying common PCEs).

The Court's role is not to second-guess the Service's scientific determinations. Under the ESA, the agency must base its actions on evidence supported by "the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8); 16 U.S.C. § 1536(a)(2). "The determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise[.] When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (citations omitted).

The Court defers to the scientific expertise of the Service that "the conservation of each species is dependent upon a functioning ecosystem to provide its fundamental life requirements, such as a certain soil type, minimum level of rainfall, or suitable water quantity (in the case of the three damselflies)," and its

decision to "consider the physical or biological features present in the ecosystems described in this rule to provide the necessary PCEs for each species." 77 Fed. Reg. at 57698. Because ANC has offered no cogent and supported reason why deference should not be afforded here, the Court declines to disturb the Service's conclusion that "[b]ased on an analysis of the best available scientific information, functioning native ecosystems provide the fundamental biological requirements for the narrow-range endemics addressed in this rule." 77 Fed. Reg. at 57102.

## IV.   **LDU-8 Meets Critical Habitat Standards**

### A.   **LDU-8 Contains Plant PCEs and Coral Outcrop Substrate PCE**

ANC posits that LDU-8 does not contain all of the native plant PCEs. There is no requirement, however, that the unit do so. *Home Builders Ass'n of N. Cal. v. U.S. Fish and Wildlife Serv.,* 616 F.3d 983, 98 (9th Cir. 2010).[2] Nor is there any requirement that LDU-8 be able to support all, or even one, native plant species at every point within its borders. Critical habitat includes areas "which may require special management considerations or protection." 16 U.S.C. § 1532(5)(a)(i). In other words, by definition, it includes areas that may not support listed species at the

_____

[2]ANC admits to the presence of at least three PCEs on LDU-8. *See* Plf's Mot. for Summary Judgment (Dkt. No. 32), at 30.

time of the habitat's designation. Referring to portions of LDU-8 as "degraded" is therefore, by itself, of little meaning.[3]

Significantly, LDU-8 contains the coral substrate PCE necessary for the 'akoko. This conclusion is supported by the record whether the Service utilizes the 1972 USDA soil data or the site survey data from 2011 and 2012 – each one confirmed the presence of coral outcrop. *See* AR 3040a, 4755-57; *see also* ANC Mem. in Opp. at 31 (Confirming the presence of coral outcrop substrate in LDU-8, noting that "ANC has provided site-specific data showing that less than 10 percent of LDU8 contains the coral outcrop substrate required for 'akoko."). LDU-8 also contains the soil type necessary for most of the remaining 15 plant species for which LDU-8 has been designated critical habitat, and the presence of other soil types does not preclude the suitability of the area for 'akoko, as the Service has shown that other soils were present in areas where the species was historically observed. *See* AR 12701-04; 12910-15; *see also* AR 12750, 12755-81, 13622, 13625, 13636, 13640 (noting other native plants historically present in coral outcrop).

---

[3]While certainly not dispositive, the Court notes that the Service removed 193 acres from its LDU-8 designation, leaving the 99 acres in controversy, because the 193 acres were "too degraded to support the species or be functionally restored to support the essential features and habitat[.]" 77 Fed. Reg. at 57658.

The Court will not substitute its scientific judgment for that of the Service, which reasonably concluded that LDU-8 meets the criteria for critical habitat for these species.

### B.    LDU-8 Is Essential to the Conservation of Plant Species

ANC argues that the Service failed to support its finding that areas currently occupied by each of the species are inadequate for conservation of those species, as required by 50 C.F.R. §424.12(e).   It contends, for instance, that the number of mature 'akoko plants needed for the conservation of the species, as well as the related acreage needed is determined arbitrarily by the Recovery Strategy, and that the needed acreage does not consider the propagated or outplanted areas where 'akoko is already growing, thereby making it arbitrary to determine that currently occupied habitat is not enough.   The Service responds that although it is not required to find that LDU-8 is essential to the listed species, namely the 'akoko, because the unit was occupied by 'akoko at the time of listing, it did so anyway. *See* 77 Fed. Reg. at 57714 ("[T]he area being designated contains the physical and biological features of the lowland dry ecosystem and the coral outcrop substrate that is essential for the conservation of *C. skottsbergii* var. *skottsbergii*. . . . These physical and biological features are essential to the conservation of the species in this location because the conservation of the species requires reestablishment of

populations of this species in areas where it once occurred."); *see also* AR

12685-12881, 12882-13065.

Regulations require the Service to "designate as critical habitat areas outside

the geographical area presently occupied by a species only when a designation

limited to its present range would be inadequate to ensure the conservation of the

species." 50 C.F.R. §424.12(e). The Final Rule makes this finding explicitly:

> To the extent that portions of this unit may not have been occupied at the time of listing, they are essential to the conservation of the species because, as discussed above, conservation of this species will require establishment of additional populations and this is one of the few suitable locations. Oahu—Lowland Dry—Unit 8 is one of four locations included in this final critical habitat designation that is essential to the conservation of *Chamaesyce skottsbergii* var. *skottsbergii*. It was previously occupied by the species and still contains the features essential to its conservation, such as the unique coral outcrop substrate. . . .
>
> A designation limited to areas presently occupied by the species would be inadequate to ensure the conservation of the species because the one occupied unit (only Oahu—Lowland Dry—Unit 11, see below, is occupied by wild individuals; Oahu—Lowland Dry—Unit 9 contains outplanted, propagated individuals) would not provide enough area to support 7 to 8 populations needed for recovery, as determined in the ''Recovery Needs and Strategy for *Chamaesyce skottsbergii* var. *skottsbergii* (Ewa Plains akoko)'' (Service 2012, entire). There are no other geographic areas that are both undeveloped and contain the species specific PCE of coral outcrop substrate.

77 Fed. Reg. at 57714.   Even assuming that FWS did not fully consider the effect of LDU-9's outplanted population of 'akoko in determining that the current occupied areas are not sufficient for conservation, LDU-9 only consists of 17 acres. Therefore, even considering that population, the size of the occupied areas would not be sufficient to support the seven to eight populations needed for recovery.

With respect to the other 15 plant species, ANC characterizes the Final Rule as finding that their current occupied areas must be inadequate because these species have small populations.   ANC argues that although existing populations may be inadequate, the Final Rule makes no finding that the areas currently occupied by those populations are actually inadequate for their conservation.   *See* 77 Fed. Reg. at 57714 ("[W]e have determined the lands within this unit [LDU-8] are essential for the conservation of these [15] lowland dry species, because they provide the habitat necessary for the reestablishment of wild populations within the historical ranges of the species . . .   Due to their small numbers of individuals or low population sizes, these species require suitable habitat and space for expansion or reintroduction to achieve population levels that could achieve recovery[.]").

The Service points to the decline of several of these other species, which it characterizes as being on the verge of extinction.   It identifies the *Gouania meyenii* that is no longer found in the lowland dry ecosystem, and the *Isodendrion pyrifolium*

that is no longer found on Oahu. 77 Fed. Reg. at 57693. It also points to the low

population numbers for several of these species. The 2011 HPPRCC revised

recovery objective guidelines, upon which the Service relied, indicate that 75 to 300

mature reproducing individuals are necessary to prevent imminent extinction,

depending on the life span (*i.e.*, long-lived perennials, short-lived perennials, or

annuals). AR 16325. The population numbers for several plant species are well

below this range. The Service points to *Bonamia menziesii* (fewer than 60

individuals), *Euphorbia haeleeleana* (65 individuals), *Gouania vitifolia* (58 to 64

individuals), *Hibiscus brackenridgei* (47 to 50 individuals), *Neraudia angulata*

(over 200 individuals), and *Schiedea kealiae* (one population between 50 and 100

individuals). 77 Fed. Reg. at 57690-96. Considering the low population numbers

combined with the need for 1,000 to 10,000 mature reproductive individuals for

recovery, depending on life span, *see* AR 16328, and the space required for these

populations, the Service reasonably concluded that the areas currently occupied by

these species are not sufficient for conservation.

In reviewing the Service's inclusion of LDU-8, the Court is mindful that the

purpose of critical habitat designation is to promote the recovery of the species.

*Home Builders*, 616 F.3d at 989 ("'[T]he purpose of establishing critical habitat is

for the government to carve out territory that is not only necessary for the species'

survival but also essential for the species' recovery.'   Thus, *Gifford Pinchot* requires FWS to be more generous in defining area as part of the critical habitat designation.   [Plaintiffs'] attempt to use the case in support of its argument that FWS should have included less area within the critical habitat designation makes no sense.   *Gifford Pinchot* says nothing about how many PCEs must be included in an area for it to be classified as critical habitat.") (quoting *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004)).

The Court also acknowledges that the Service has significant discretion in determining whether to exclude particular areas.   *See* 16 U.S.C. § 1533(b)(2) (the Service "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it] determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned."); *see also Cape Hatteras Access Preservation Alliance v. U.S. Dep't of the Interior*, 731 F. Supp. 2d 15, 29 (D.D.C. 2010) ("The plain reading of the statute fails to provide a standard by which to judge the Service's decision not to exclude an area from critical habitat."). In light of the discretion afforded the agency, the Court concludes that the Service

appropriately made its critical habitat designation in a manner consistent with the scientific evidence available, including with respect to LDU-8.

## V.     The Service Considered the Economic Impact of its Designation

The ESA mandates consideration of economic impact before the designation of critical habitat.    16 U.S.C. § 1533(b)(2).    An agency is required only to "consider" the economic impact.    *See Alaska Oil and Gas Ass'n v. Salazar*, 916 F. Supp. 2d 974, 993 (D. Alaska 2013) ("the legal hurdle regarding the Service's analysis of the economic impacts of designation is fairly low.    The Service must show only that it *considered* all potential economic impacts of the designation. . . . [T]he statute and regulation merely state that the Service must solely *consider* all such costs.    The Service then has complete discretion over the application of such analysis vis-à-vis critical habitat designation"); *id.* at 992 ("Although Congress has turned over the analysis of the impacts cutting in favor or against critical habitat designation to the discretion of the Service, the Service is still required to show that in arriving at its decision, it took into consideration the economic and other relevant impacts.    Specifically, the Service must consider 'economic impact[s] *before* the designation of critical habitat.'    However, '[a]gencies must consider only those indirect effects that are reasonably foreseeable.    They need not consider potential effects that are highly speculative or indefinite.'") (citations omitted); *Building*

*Industry Ass'n of Bay Area v. U.S. Dep't of Commerce*, 2012 WL 6002511, at 5

(N.D. Cal. Nov. 20, 2012) ("[T]he court finds that the text of section 4(b)(2) is clear

in requiring NMFS to 'consider' the economic impact of designation. . . .   However,

the statutory text does not specify any particular methodology that must be used to

accomplish this 'consideration.'").   The Service is presumed to have followed

regulations and considered required impacts unless rebutted by evidence in the

record to the contrary.   *Rock Creek Alliance v. FWS*, 663 F.3d 439, 443 (9th Cir.

2011).

The Final Rule explains how the FEA quantifies the economic impacts of

potential conservation efforts:

> The economic impact of the final critical habitat designation is
> analyzed by comparing scenarios both ''with critical habitat''
> and ''without critical habitat.''   The ''without critical habitat''
> scenario represents the baseline for the analysis, considering
> protections already in place for the species (e.g., under the
> Federal listing and other Federal, State, and local regulations).
> The baseline, therefore, represents the costs incurred regardless
> of whether critical habitat is designated.   The ''with critical
> habitat'' scenario describes the incremental impacts associated
> specifically with the designation of critical habitat for the
> species.

77 Fed. Reg. at 57739.   The FEA estimates with respect to ESA, Section 7

consultation that:

The upper bound of administrative costs and conservation efforts to the Service, Federal agency, and third parties related to section 7 consultation in occupied critical habitat constitute the majority of total baseline costs (approximately 72 percent). Total future baseline impacts are estimated to be $105,000, which equates to (1) $54,178 in present value terms using a 7 percent discount rate over the next 20 years (2011 to 2031); (2) $77,075 in present value terms using a 3 percent discount rate over the next 20 years; or (3) $5000 annualized over the next 20 years.

The upper bound of administrative costs and conservation efforts to the Service, Federal agency, and third parties related to section 7 consultation in unoccupied critical habitat constitute the majority of total incremental costs (approximately 28 percent). Total future incremental impacts are estimated to be $40,000 over the next 20 years (2011 to 2031). Annualized incremental administrative in present value terms using a 7 percent discount rate over the next 20 years is $3,692, or $1,905 using a 3 percent discount rate.

*Id.* With respect to potential economic impacts,

The FEA estimates total upper bound potential economic impacts in areas proposed as critical habitat over the next 20 years (2011 to 2031) to be $145,000, which equates to (1) $94,178 in present value terms using a 7 percent discount rate over the next 20 years (2011 to 2031); (2) $117,075 in present value terms using a 3 percent discount rate over the next 20 years; (3) $5000 annualized using a 7 percent discount rate over the next 20 years, or (4) $6,905 using a 3 percent discount rate over the next 20 years.

*Id.* As a result, the Service concluded that:

Our economic analysis did not identify any disproportionate costs that are likely to result from the designation. Consequently, the Secretary has determined not to exercise his

discretion to exclude any areas from this designation of critical
habitat for the 124 species based on economic impacts.

*Id.* at 57740.

ANC argues that the Service improperly limited its analysis to administrative

costs associated with ESA Section 7 consultation—$145,000 in total, of

which $40,000 is attributable to LDU-8—but ignored the $7.6 million in lost

development that the FEA showed would result from designation of LDU-8. *See*

77 Fed. Reg. at 57739; AR 9589. The plain language of the Final Rule, however,

shows that the Service did consider these economic impacts as well. *See* 77 Fed.

Reg. at 57739-40, 57661-63; AR 1243-45, 1264-65, 1275-80. The Final Rule

specifically addresses the $7.6 million amount. *See* Fed. Reg. at 57743 ("Table 4 in

Part II of the Final Economic Analysis concludes that the upper bound of economic

impacts to small businesses as follows: (1) Property Value Impacts (based on a total

property value impact (upper-bound) of $7,620,971 for the two unoccupied parcels

in LDU8)—2 firms could potentially be affected, and realize a $351,666 average

annualized property value impact at a 7 percent discount rate ($247,193 at a 3

percent discount rate), based on average receipts of $14,673,156.").

As the Service notes, it was responsive to ANC's public comments regarding

economic analysis, and modified it where appropriate. *See, e.g.,* 77 Fed. Reg. at

46

57661 (noting possibility of federal nexus for Section 7 consultation purposes and examining upper-bound of economic costs); *id*. at 57661-62 (recognizing LDU-8 within planned Kapolei West Project with vested development rights); *id.* at 57662 (economic impacts on small businesses); *id*. at 57663 (responding to comments on plans for development in LDU-8; responding to comments that economic impact understated by using tax assessment values and failed to account for future revenue streams); AR 1275 ("Based on public comment received regarding the draft economic analysis, the Service is now assuming that it is likely that that planned development for Kapolei West, which overlays proposed critical habitat will likely entail a section 7 consultation.").

ANC also argues that the FEA understated the true cost of designating LDU-8 because it does not account for the cost of Section 7 consultation. To the extent this argument is based on post-decisional data submitted with ANC's 60-day notice, the Court does not consider it. Further, the Service is owed deference in determining the best commercial data to employ. *See Alaska Oil and Gas Ass'n*, 916 F. Supp. 2d at 993 ("With regard to future direct administrative costs to be incurred through Section 7 consultation, the Court will defer to the Service's technical expertise in its cost projections."). Yet even without that deference, the Court finds that to the extent economic impact is required to be considered, the Service clearly did so here,

47

and on the basis of reasoning and studies that the Court has no reason to question.

Therefore, the FEA is not flawed on this basis and the Service complied with the

ESA's mandate to consider economic impacts.[4]

## VI.  NEPA Does Not Apply to Critical Habitat Designations

ANC argues that the Service violated NEPA by failing to analyze the

environmental effects of the Final Rule, such as through the preparation of an

Environmental Impact Statement ("EIS").   The Ninth Circuit has expressly held

that NEPA does not apply to critical habitat designations.   *Douglas County v.*

*Babbitt*, 48 F.3d 1495, 1501-08 (9th Cir. 1995).   In so holding, the Ninth Circuit

_____

[4]The Court does not review the Service's ultimate decision not to exclude LDU-8 from
designation, which is committed to the agency's discretion.

> In this case, section 4(b)(2) of the ESA does not provide any standard by which to
> judge an agency's decision not to exclude an area from critical habitat designation.
> . . .   Put another way, section 4(b)(2) provides a standard of review to judge
> decisions to exclude, but provides no such standard to review decisions not to
> exclude.   Thus, the agency action in this case is committed to agency discretion by
> law, and the APA precludes court review of NMFS' ultimate decision.   *See also*
> *Cape Hatteras Access Preservation Alliance v. U.S. Dept. of the Interior*, 731
> F.Supp.2d 15, 29 (D.D.C.2010) ("The plain reading of the statute fails to provide a
> standard by which to judge the Service's decision not to exclude an area from
> critical habitat."); *Home Builders Ass'n of Northern California v. U.S. Fish &*
> *Wildlife Service*, 2006 WL 3190518 (E.D. Cal. 2006) ("[T]he court has no
> substantive standards by which to review the [agency's] decisions not to exclude
> certain tracts based on economic or other considerations, and those decisions are
> therefore committed to agency discretion.").

*Building Industry Ass'n of Bay Area v. U.S. Dep't of Commerce*, 2012 WL 6002511, at *7 (N.D.
Cal. Nov. 30, 2012).

articulated three reasons why critical habitat designations are not subject to NEPA:
(1) the ESA displaced the procedural requirements of NEPA with respect to critical
habitat designation; (2) NEPA does not apply to actions that do not alter the physical
environment; and (3) critical habitat designation serves the purposes of NEPA by
protecting the environment from harm due to human impacts. *Id. See also Drakes
Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1090 (9th Cir. 2014) ("The Secretary's . . .
designation under the ESA, 'protects the environment from exactly the kind of
human impacts that NEPA is designed to foreclose.'") (citing *Douglas County*, 48
F.3d at 1507)).

Because the Service was not required to comply with NEPA when
designating critical habitat, the Service's related standing objection is moot.

## CONCLUSION

For the foregoing reasons, the Court DENIES ANC's motion for summary
judgment, and GRANTS the Service's cross-motion for summary judgment.

IT IS SO ORDERED.

DATED: September 30, 2014 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge